**NEW BEDFORD DEFENSE PRODUCTS DIVISION OF The FIRESTONE TIRE & RUBBER COMPANY, Plaintiff, Appellant,**

v.

**LOCAL NO. 1113 OF The INTERNATIONAL UNION, UNITED AUTOMOBILE, AIRCRAFT AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA (UAW, AFL–CIO), et al., Defendants, Appellees.**

No. 5349.

United States Court of Appeals
First Circuit.

Heard June 4, 1958.

Decided July 24, 1958.

Stuart Macmillan, Boston, Mass., with whom William A. King and Haussermann, Davison & Shattuck, Boston, Mass., were on brief, for appellant.

Harold B. Roitman, Boston, Mass., for appellees.

Before MAGRUDER, Chief Judge, and WOODBURY and HARTIGAN, Circuit Judges.

MAGRUDER, Chief Judge.

This appeal is from a decree, under § 301 of the Labor Management Relations Act of 1947, 61 Stat. 156, 29 U.S. C.A. § 185 ordering appellant Company to submit a certain grievance claim to arbitration. For another case decided by us today involving the same statute, see Boston Mutual Life Insurance Co. v. Insurance Agents' International Union, AFL-CIO, 258 F.2d 516. There, we reaffirmed the position this court had previously taken, that when one of the parties to a collective bargaining agreement invokes the aid of a court of equity, under § 301, and asks the court for a decree of specific performance of a contract to arbitrate, the court, before rendering such a decree, has an inescapable obligation to determine as a preliminary matter whether the defendant did contract to refer the issue to arbitration.

In the present case, we think the district court correctly determined that the Company had contracted to refer the grievance in question to arbitration, and that its decree for specific performance should be affirmed.

The Firestone Tire & Rubber Company is an Ohio corporation, having its principal place of business in Akron, Ohio, and maintaining a separate division known as New Bedford Defense Products Division, in New Bedford, Massachusetts, where it is admittedly engaged in an industry affecting commerce within the meaning of the Act. Local 1113 of the International Union, United Automobile, Aircraft and Agricultural Implement Workers of America (UAW, AFL-CIO), is an unincorporated labor association authorized to act as bargaining representative for the production and maintenance employees at the plant of the New Bedford Defense Products Division of The Firestone Tire & Rubber Company.

The Company and the Union entered into a collective bargaining agreement to commence April 9, 1956, and run until April 9, 1959, and thereafter from year to year unless terminated by specific notice. The agreement provided, in Art. II, § 2, a typical grievance procedure in-

volving successive stages, culminating in a reference of the grievance to a meeting of the Grievance Committee and the Industrial Relations Department.

Article II, § 3, was as follows:

"(a) In the event any grievance concerning the interpretation or application of this Agreement, excepting such grievances as are not arbitrable hereunder, is not satisfactorily settled through the procedure outlined above, it may be submitted to arbitration upon the written request by the aggrieved party to the other party, with a copy to the impartial arbitrator. The grievance to be arbitrated shall be identified and described in said written request.

"(b) A representative of the Company and a representative of the Union shall select an impartial arbitrator for a term mutually agreed upon by the representatives.

"(c) The decision of the impartial arbitrator shall be final and conclusive upon the Company, the Union and the affected employee or employees.

"(d) The impartial arbitrator shall have no power to add to, subtract from, or modify any provision of this Agreement.

"(e) Matters involving the general wage scale or differentials in the maximum hourly rates which are established at the effective date of this Agreement shall not be a subject for arbitration.

"(f) Any agreed salary and expense incident to the services of the impartial arbitrator shall be shared equally by the Company and the Union."

Article III contained provisions as to hours of work and overtime payments. Article IV related to holidays. Article V, entitled "General Wage Provisions", throws some illumination upon the phrase "general wage scale" as used in Art. II, § 3(e), supra.

Article V consisted of two paragraphs which read:

"*Section 1*

"(a) Attached to this Agreement, as Exhibit A, is a list of job classifications, together with corresponding maximum hourly rates presently in effect. The general wage scale, presently in effect, shall remain in effect for the duration of this Agreement except as provided under Exhibit A.

"(b) The differentials in established maximum hourly rates, presently in effect, shall remain in effect for the duration of this Agreement."

Exhibit "A" so referred to lists the jobs in the several departments of the Company, together with the maximum hourly rate applicable to them. For instance, in the Forge, Department No. 494, there are three positions mentioned, namely, Forging Operator, at $1.73, Breaking Operator, at $1.70, and Machine Operator, at $1.65.

Article VI referred to wages. Thus in Art. VI, § 1(b), it was provided:

"In cases where it is not possible to use the full time of a fully qualified worker, he will receive the established hourly rate of his classification provided he satisfactorily performs the work that is assigned. However, if later it is possible to use more fully the time of the employee, he shall perform the added work without change in the hourly rate."

Article VII set forth various provisions relating to the ascertainment of seniority, and the effect thereof. Section 1(b) contained the following definition, which must be read into the succeeding Article with reference to vacations:

"The term 'active payroll' as used in this Agreement means the list of employees who have qualified to receive wages from the Company and who have not been removed from the list due to discharge, quit, layoff, leave of absence, transfer to inactive payroll."

Article VIII dealt with "Vacations". Section 1(a) provided as follows:

"Employees who are on the active payroll on October 31 of the current year, and who previous to that date have completed one (1) year's seniority, but less than three (3) years' seniority and have worked at least six (6) months during the previous twelve (12) months, shall receive one (1) week's vacation with pay during the vacation period starting on October 31 of the current year."

And § 2 read in full:

"The 1956 vacation period will be from October 31, 1955 to October 30, 1956 inclusive. Vacation periods for succeeding years will be similar twelve (12) month periods."

Article IX covered "Insurance & Severance", and Art. X contained general provisions which need not now be detailed. The concluding Art. XI prescribed the period in which the agreement was to be effective.

In the summer of 1957 the Union had filed four written grievances unrelated to the one now in issue. Pursuant to the collective agreement, these complaints were taken through the initial grievance procedure without success. The Union then asked for arbitration. The parties agreed in writing to submit these four grievances to Mark Santer as arbitrator.

Meanwhile, on or about September 16, 1957, due to a curtailment in production caused by cancellation of government orders, the Company laid off approximately 93 employees who were members of the bargaining unit. Subsequently, but before October 31, 1957, additional employees were laid off for the same reason. All of these employees had received during 1957 a vacation with pay for the year 1956–1957 in accordance with the terms of the contract. None of these employees were on the "active payroll" as defined in Art. VII, § 1(b), on October 31, 1957, nor have any of them been re-hired by the Company.

On October 23, 1957, the Grievance Committee of the Local presented to the foreman of the New Bedford plant a claim, No. A–48152, that in the case of one of the laid-off employees, Rymszewicz (selected as a test case), "the Company has violated the terms of the Contract (or Agreement) by refusing to pay a vacation pay to the employees who have been laid off as a result of the government termination of contract for production with the company. It is the specific request of the Union that the Company immediately compensate the aggrieved parties by paying said vacation pay to the same."

On October 25, 1957, Walkinshaw, the sub-regional director of the Union, wrote to O'Neil, the Director of Industrial Relations at the New Bedford Defense Products Division, stating that the Local intended to proceed with the foregoing grievance and that if it was not adjusted "we propose to arbitrate the matter". O'Neil replied that in his opinion "there has been no violation of contract concerning this grievance."

At a subsequent conference with arbitrator Santer, O'Neil and an attorney on behalf of the Company agreed to submit to the arbitrator the question whether, under the terms of the collective bargaining agreement, grievance A–48152 was arbitrable; if the answer was "no" that disposed of the case, whereas if the answer was "yes" it would mean "the Company and the Union will go forward on the merits."

On December 11, 1957, arbitrator Santer filed a report and an award to the effect that, "Under the terms of the collective bargaining agreement, dated April 9, 1956, Grievance No. A–48152 is arbitrable."

On January 16, 1958, before Santer had proceeded to arbitrate the grievance on its merits, Firestone Tire & Rubber Co. filed a complaint in the United States District Court for the District of Massachusetts against Local No. 1113 asking for a declaratory judgment to the effect that, under the collective agreement, the laid-off employees "are not entitled to additional vacation pay" and "that the grievance claim filed by the union on behalf of those employees laid off in September 1957 is NOT subject to arbitra-

tion". The Union filed its answer, and a counterclaim under § 301, asking a decree ordering the plaintiff to "complete the arbitration of the grievance under the contract."

■ We think it clear that the grievance in question is the kind of individual grievance "concerning the interpretation or application" of provisions of the collective agreement relating to vacation pay which normally would be submitted to arbitration. And we agree entirely with the conclusion of the district court that this grievance is not rendered inarbitrable by the provision in Art. II, § 3(e), supra, reading as follows:

"Matters involving the general wage scale or differentials in the maximum hourly rates which are established at the effective date of this Agreement shall not be a subject for arbitration."

It is true that if the employees in question are entitled to any vacation pay, the amount thereof must be ascertained by taking a percentage of the employees' earnings as listed in Exhibit A, the general wage scale which, under Art. V, must remain in effect for the duration of this agreement. The same would be true of individual grievances relating to overtime payments (Art. III), holidays (Art. IV), or grievances under Art. VI. But surely the exception to arbitrability in Art. II, § 3(e), was not intended to exclude all grievances having any relation to earnings. The grievance now in question, for instance, does not seek to subvert the maximum hourly rate of $1.73 for a Forging Operator, or to challenge the three-cent differential between the pay of a Forging Operator and a Breaking Operator, as given in the general wage scale attached to the agreement as Exhibit A. It is certainly of no consequence that, under various public statutes such as the Bankruptcy Act, 11 U.S.C.A. § 1 et seq., the Social Security Act, 42 U.S.C.A. § 301 et seq., or the Labor Management Relations Act, 29 U.S. C.A. § 141 et seq., the term "wages" is held to include various so-called "fringe benefits", of which vacation pay is one.

The phrase "Matters involving the general wage scale" was here used in a wholly different context, prescribing an exception to arbitrability of grievances under a collective bargaining agreement.

Furthermore, the district court held that a grievance does not cease to be arbitrable merely because its correct disposition on the merits may be thought to be clear under the terms of the agreement. The court said [160 F.Supp. 112]:

"It seems clear to this Court that it is a question of the interpretation and application of the 1956 collective bargaining contract whether particular employees laid off before October 31, 1957 are within the group of persons entitled to 1958 vacation pay. Of course, it is equally clear to the Court and perhaps to the arbitrator what the answer to that question is. But this is of no moment. If the labor organizations under an *interpretation* of Article VIII or some other part of the 1956 collective bargaining agreement (and not as a result of some addition to that contract) contend that X is entitled to 1958 vacation pay, the issue is arbitrable under the contract. Issues do not lose their quality of arbitrability because they can be correctly decided only one way."

■ In this respect we think that the jurisdiction of the arbitrator, whose judgment is invoked in the collective bargaining agreement instead of that of the court, is similar to a court's jurisdiction. If the subject matter of a claim is within the court's jurisdiction, the court does not lose its jurisdiction because of the fact that the proper disposition of the claim may be crystal-clear under the law. Indeed, if in the present case the grievance in question is confided to an arbitrator by the collective bargaining agreement, the court in a § 301 proceeding has no business to concern itself with a preliminary question whether the answer to the grievance on its merits may or may not be entirely clear under the language of the agreement. We de-

cided nothing to the contrary in Local 205, etc. v. General Electric Co., 1956, 233 F.2d 85. Of course, we do not mean by the foregoing to intimate how we think the grievance should be decided on its merits. Cf. Division of Labor Law Enforcement, Department of Industrial Relations v. Ryan Aeronautical Co., 1951, 106 Cal.App.2d Supp. 833, 236 P.2d 236.

Therefore, the district court's decree correctly declared that "Arbitrator Santer has jurisdiction to hear and determine on the merits grievance claim No. A–48152", and correctly decreed that The Firestone Tire & Rubber Co. "shall submit forthwith to arbitration of the merits of grievance claim No. A–48152 * * *"

A judgment will be entered affirming the judgment of the District Court.